IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

HARBOUR COVE MARINE
SERVICES, INC.,

       Plaintiff/Counterclaim Defendant,

       v.                              Civil No. 02-1695 (RBK)

ELLIS RABINOWITZ, et al.,

       Defendants/Counterclaim Plaintiffs.

**O P I N I O N**

**KUGLER**, United States District Judge:

Currently before the Court in this action for a declaratory judgment is Plaintiff Harbour Cove Marine Service's ("HCMS") motion for summary judgment and the cross-motion for summary judgment filed by Defendants David Rain and Edward Grogan. For the reasons to follow, the Court will grant in part and deny in part Plaintiff's motion for summary judgment. The Court will deny in its entirety Defendants' cross-motion for summary judgment.

**I. INTRODUCTION**

This case arises out of a fire that started when Mike Perry, an HCMS employee, was attempting to repair a hole in some plastic shrinkwrap that was wrapped

around the vessel *Forget-Me-Knot*. One method for storing a boat for winter is to wrap shrinkwrap around it. The shrinkwrap is sealed by heating the shrinkwrap with a heat gun so that the shrinkwrap melts onto itself and tightens around the boat. While Perry was attempting to repair a hole in the already-wrapped *Forget-Me-Knot* by melting more shrinkwrap over the hole, he somehow set the shrinkwrap ablaze. Perry did not have a fire extinguisher nearby when the fire started, so the fire spread quickly to other, nearby boats and caused significant damage to several of them.

Because HCMS is seeking a declaration of non-liability, the boat owners are Defendants in this case. HCMS now seeks summary judgment on its declaratory action against boat owners Ellis Rabinowitz, Edward Grogan, and David Rain. HCMS also seeks summary judgment on all counterclaims brought by these Defendants. Defendants Rain and Grogan have filed a cross-motion for summary judgment. Rabinowitz is the owner of the *Forget-Me-Knot*, but Standard Fire Insurance Co. has intervened on his behalf as a subrogee.

In support of its motion, HCMS relies principally on the exculpatory language contained in the Winter Storage Agreement ("WSA").[1] The relevant language

---

[1] In its Complaint, HCMS seeks a declaratory judgment on several legal issues, including its right to be indemnified by certain Defendants and its right to be named as an insured under certain Defendants' policies. But its moving brief raises only two general arguments: (1) "The exculpatory provisions in the WSAs relieve HCMS of any liability arising out of the fire"; and (2) "As an employee of HCMS, Perry cannot be liable for any damages." Though HCMS's brief mentions its right to indemnification in passing, its sole focus is on the exculpatory provisions in the WSA. Therefore, only HCMS's liability arising out of the fire and Mike Perry's personal liability will be addressed in this Opinion.

of the WSA reads as follows:

> HCMS has for rent ground space for winter placement of boats and equipment and the Owner wishes to use said ground space. HCMS is willing to rent said ground space to Owner upon certain terms and conditions and to evidence the same, it is mutually agreed as follows:
>
> It is expressly agreed that the contract is for rental of ground space and services and is not a bailment agreement.
>
> HCMS agrees to remove Owner's boat from the water in the fall, place said boat on HCMS property, and launch said boat in the spring, upon full compliance by Owner of the following conditions:
> * * *
> 2. That Owner, at Owner's own cost and expense, shall maintain insurance protecting and indemnifying HCMS and Owner against any and all claims for injury or damage to persons or property or for the loss of life or of property arising out of the storage of Owner's boat. All such insurance shall be affected under valid and enforceable policies: shall be issued by insurers of recognized responsibility acceptable by HCMS and shall contain a provision whereby the insurer agrees not to cancel the insurance without twenty (20) days' prior written notice to HCMS. On or before Owner's boat is placed upon HCMS premises, Owner shall furnish HCMS with a certificate evidencing the aforesaid insurance coverage, and renewal certificates shall be furnished to HCMS at least thirty (30) days prior to expiration of said policy.
>
> 3. HCMS is responsible for negligence in moving the Owner's boat or equipment out of the water and over land, but is not responsible for any damage or loss after said boat is placed.
>
> 4. That HCMS reserves the right to move Owner's boat at any time, within the HCMS premises.
>
> 5. That HCMS is not responsible for loss, damage or injury due to theft, fire, vandalism, Act of God or any other cause to boats, vehicles or equipment or contents once said property is placed for the winter.
>
> 6. No one will be allowed to work on the boat without the express written consent of HCMS.

> 7. That HCMS will not be responsible for any injuries to the Owner, family of Owner or guests while on HCMS premises.
>     * * *

HCMS Ex. 15.

  Rabinowitz, Rain, and Grogan each signed a WSA for the winter placement of their boats. Now, in opposition to HCMS's motion for summary judgment, these boat owners argue that the language of the WSA does not exculpate HCMS from liability under the circumstances of this case. In particular, they argue that the WSA does not clearly except HCMS from liability for its own negligence after the boat is placed. Rather, the boat owners contend, the WSA is ambiguous on that point. And because the exculpatory provisions in the WSA are ambiguous, the argument goes, it should not be enforced to bar a suit for negligence for two reasons. First, because clauses that attempt to limit one's liability for one's own negligence must do so clearly and unambiguously, the WSA should not be construed to limit HCMS's liability for its own negligence. Second, they argue that exculpatory provisions such as those in the WSA are disfavored in admiralty and, for that reason, should be narrowly construed.

  In addition to the above arguments, Standard Fire presents an additional, distinct argument from those of Rain of Grogan. Specifically, Standard Fire argues that when Perry set fire to the *Forget-Me-Knot*, Perry was acting pursuant to a separate agreement that provided for winterization of that vessel. That agreement, which is simply a work order, lists several services to be performed on the *Forget-Me-Knot*. Included in that list is the task of shrinkwrapping the boat with fifty-five linear feet of shrinkwrap. At

the bottom of the work order it states, "[i]t is also understood that [HCMS] will not be held responsible for loss or damage to the unit (or articles left in or with the unit) in case of fire theft, accident, inclement weather conditions or any other cause beyond [HCMS's] control." HCMS disputes that Perry was acting pursuant to this winterization agreement. Rather, HCMS contends Perry was performing routine maintenance consistent with the WSA.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether there is a disputed issue of material fact, a court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party. Id. at 250; Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the

nonmoving party bears the burden of persuasion at trial, however, "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The non-moving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material of fact. FED. R. CIV. P. 56(e); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (citation omitted). "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 322).

### III. DISCUSSION

The Court will grant HCMS's motion for summary judgment with respect to Defendants Rain and Grogan on the issue of HCMS's liability for damages caused by its own negligence. In turn, the Court will deny the cross-motion for summary judgment filed by Rain and Grogan. The Court will deny HCMS's motion with respect to Standard Fire as subrogee of Ellis Rabinowitz.

Because this case arises out of a contract and alleged torts concerning vessels stored at a marina on navigable waters, this Court has admiralty jurisdiction. See

Sisson v. Ruby, 497 U.S. 358, 367 (1990) ("[S]toring and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity."). Maritime law–the federal common law that has developed under the admiralty jurisdiction of federal courts–governs the Court's interpretation of the WSA and winterization agreement. Sander v. Alexander Richardson Investments, 334 F.3d 712, 715 (8th Cir. 2003). Further, this matter presents an actual controversy inasmuch as resolving the declaratory judgment action will provide a necessary answer to the question whether HCMS is liable for actions in negligence that are currently pending–and were certain to emerge at the time this action was filed. See Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.") Because a controversy exists–and because that controversy invokes the Court's admiralty jurisdiction–the Court has jurisdiction, under 28 U.S.C. § 2201, to decide this declaratory judgment action filed by HCMS.[2]

---

[2] Section 2201 states, in part, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

### A. Rain and Grogan

The Court need look no further than the WSA to decide HCMS's motion for summary judgment as it pertains to Rain and Grogan. The terms are sufficiently clear and unambiguous so that it is unnecessary and improper to look outside the WSA to other evidence.[3] Paragraph 3 of the WSA explicitly defines the period during which HCMS will be liable for its negligence: while it is being moved into winter storage. Then it provides that HCMS will not be liable for "any" damage or loss after that period. In addition, paragraph 5 states that HCMS will not be liable for loss or damages caused by fire after the boat is placed for winter. These provisions leave no doubt about the circumstances under which HCMS will be liable for its own negligence: anytime before the boat is placed for winter. After that point, the boat owners assumed responsibility. That the boat owners assumed responsibility is reinforced by paragraph 2, which requires the boat owner to maintain insurance indemnifying HCMS "against any and all claims for injury or damage to persons or property or for the loss of life or property arising out of the storage of Owner's boat." Thus, the WSA unequivocally shifted the risk of loss to the boat owners who agreed to be bound by it. HCMS is not, therefore, liable for damages caused to the boats of Rain and Grogan by HCMS's negligence.

Although the Court will ultimately rest on its ruling that the WSA should be

---

[3] Specifically, the Court is referring to the deposition testimony of Mike Perry, on which Defendants place heavy emphasis. Because the intention of the parties is clear from the language of the WSA, no further evidence is needed to interpret that agreement.

enforced as written, it will nonetheless address Defendants' arguments that the WSA's exculpatory provisions are unenforceable. Contracts limiting the drafter's liability for its own negligence are enforceable so long as the exculpatory language is clear and unambiguous. In re Wechsler, 121 F. Supp. 2d 404, 433 (D. Del. 2000). Further, though the Supreme Court in Bisso v. Inland Waterways Corp., 349 U.S. 85 (1955), expressed disapproval of exculpatory provisions in certain admiralty contracts, courts interpreting Bisso have explicitly declined to extend that ruling beyond towage contracts. See Sander, 334 F.3d at 717 ("The Ninth Circuit has distinguished Bisso and limited it to cases involving towage contracts . . . and we think rightly so.")(citing Morton v. Zidell Explorations, Inc., 695 F.2d 347, 351 (9th Cir. 1982) ("Bisso merely reaffirmed the rule for towage contracts.")). Thus, exculpatory provisions in admiralty contracts are not automatically unenforceable as violative of public policy.

Rather, the underlying reasoning of the Bisso decision provides the better gauge for determining the enforceability of an exculpatory provision. In particular, the Court in Bisso cited two overarching policy considerations that favored non-enforcement of an exculpatory provision in a towage contract: "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." Bisso, 349 U.S. at 91. The Court in Bisso explained that its ruling was "merely a particular application to the towage business of a general rule long used by courts and legislatures to

prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees,[4] employers and employees, public service companies and their customers." Id. at 91-92.  Courts following Bisso have refused to attach great significance to the label ascribed to any contractual relationship, and have instead focused their attention on the more important, controlling question:  whether the promises between the parties are enforceable, in light of their relationship and relative bargaining strength when they reached agreement.[5]  See In re Wechsler, 121 F. Supp. 2d at 434 ("In

---

[4] In support of its statement that "release-from-negligence" contracts in the bailor-bailee relationship had been historically disfavored, the Bisso Court cited to the cases collected in 175 A.L.R. 110-141.  See Bisso, 349 U.S. at 90-91 n.14.  The text of the ALR along with the cases to which it cites demonstrates that there is no blanket prohibition against a bailee contracting to limit his liability for his own negligence.  For instance, the ALR text states at one point, "[i]t has been held that the general rule to the effect that parties between whom there is no great disparity of bargaining power may agree to exempt one of them from liability for his negligence also applies in the case of the ordinary bailee, especially if the exemption attempts to protect the bailee from the consequences of his agents' negligence. 175 A.L.R. 8, § 58.  Thus, since before the time the Bisso decision was issued, the law never harbored absolute hostility towards exculpatory provisions in bailment contracts.

[5] The parties have spent considerable time arguing over whether the WSA created a bailment.  No party expresses what the Court should conclude after it decides the issue.  Presumably, Rain and Grogan believe a finding that a bailment was created would be advantageous to their position in some way; but the only conclusion urged by them is that the Court "rule that a bailment for hire was established between HCMS and the boat owners."
    A bailment exists in situations where a property owner (bailor) gives his property to another (bailee) for a purpose, with the express or implied understanding that the property will be returned in at least the same condition after the purpose for which they were given has been fulfilled.  In re Wechsler, 121 F. Supp. 2d at 438 (citing Thyssen Steel Co. v.M/V Kavo Yerakas, 50 F.3d 1349, 1354-55 (5th Cir. 1995)).  If the owner demonstrates that the property was either not returned or returned in worse condition than when it was given to the bailee, then a rebuttable presumption of negligence arises against the bailee.  Id. (citation omitted).  To establish that a bailment existed for a vessel, the owner must show that delivery to the putative bailee was complete and the putative bailee had "'exclusive right to possession of the [] property, even as against the owner.'"  Id. at 437-38 (quoting T.N.T. Marine Service, Inc. v. Weaver Shipyards &

10

this case, Georgetown was not exercising the type of monopolistic power that the Bisso . . . [Court] considered offensive.  Neither Wechsler nor the individual who was insured by Great American were at the marina's mercy.  Instead, these two claimants were free to accept or reject the terms of Georgetown's slip rental agreement."); Sander, 334 F.3d at 719 (holding that the rule set forth in Bisso is "limited to circumstances involving relationships similar to towage agreements such as bailment, employment, or public service relationships," but explaining that "[w]here the peculiarities of those types of relationships do not justify application of the doctrine, we uphold the strong public policies of recognizing parties' liberty to contract and enforcing contracts as written.").

        In the present case, there is no apparent reason not to enforce the exculpatory provisions of the WSA.  First, doing so will not undermine the policy of discouraging negligence because the WSA itself imposes significant liability on HCMS for negligence.  In particular, HCMS would have been liable for damages caused by its negligence while the boat was being placed for winter storage.  In this way, HCMS was

---

Dry Docks, Inc., 702 F.2d 585, 588 (5th Cir. 1983)).  An agreement to store or repair a boat often creates a bailment.  Id. (citing Snyder v. Four Winds Sailboat Centre, Ltd., 701 F.2d 251, 252-53 (2d Cir. 1983)).

    Assuming Rain and Grogan established that a bailment existed, it is not clear what the next step is in this case.  What use is a presumption of negligence when HCMS has limited its liability for negligence?  If Rain and Grogan intended to argue that HCMS could not limit its liability for negligence because of the bailment relationship, they fell short of doing so.  Nonetheless, as discussed in footnote 4, *supra*, the Court finds no absolute prohibition in the law against provisions limiting a bailee's liability for its own negligence.  In any event, the Court finds no bailment relationship existed because (1) the WSA explicitly disclaims a contract for bailment and (2) Rain and Grogan have failed to demonstrate HCMS retained exclusive control over their boats.

not seeking blanket absolution for its own negligence, rather it agreed that it would be liable for damages caused during the period HCMS had the greatest propensity to cause damage: while the boat was being moved. Rain and Grogan make this exact point in their brief: "Obviously [the time when HCMS is moving and placing the boat for storage] is the most significant event with respect to the hauling and winterizing of a boat for winter. After a boat is placed on the ground and winterized HCMS does not do anything to the boat until spring." (See Brief of Rain and Grogan at P. 6). Thus, by Rain and Grogan's own admission, HCMS wrote a contract that exposed HCMS to liability for its own negligence during the most significant period of the agreement. For that reason, the exculpatory provisions in the WSA inflict no injury on the policy of discouraging negligence.

Second, nothing in the record suggests HCMS wielded power over Rain or Grogan that would permit HCMS to demand accord on its proposed contract. Rain and Grogan argue that the WSA is "[c]learly . . . a contract of adhesion as it was a form document, offered to HCMS' clients on a take it or leave it basis and did not afford the customer with an opportunity to negotiate the terms of the contract." To argue that the WSA was a contract of adhesion misses the point in this case.[6] Rather, the focus is on

---

[6] A contract of adhesion is not created simply by the presence of a form contract offered on a take ir or leave it basis. Rather, and though those are important ingredients for a finding that a contract is one of adhesion, there must be a showing that the contract at issue was gained through sheer economic force under circumstances where assent to its terms was absent. Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co., 610 F.2d 1174, 1180 (3d Cir. 1979) ("In the typical contract of adhesion the overborne party does not objectively manifest his assent to the

whether the bargaining positions of Rain and Grogan left them with a meaningful choice when they entered the WSA.  Clearly they had choices.  HCMS is not the only place where a boat may be stored for the winter.  If Rain or Grogan did not like the terms of the WSA, they should have bargained with HCMS or shopped around at different marinas.  Apparently, they did neither.  Of course, the HCMS facilities were most convenient for Rain and Grogan inasmuch as they kept their boats there during the boating season.  But Rain and Grogan paid the price of convenience by agreeing to the terms of the WSA.  There is no evidence that HCMS overreached Rain or Grogan to take advantage of them while they were vulnerable–economically or otherwise.  Without such evidence, the law provides no basis on which the Court can do anything other than enforce the terms of the WSA.  See Sander, 334 F.3d at 716 ("When language is this explicit, 'it is beyond the province of this Court to imply limitations or conditions on the exercise of a power to allocate risks so unmistakably expressed.'") (quoting Morton, 695 F.2d at 351).  Therefore, because the boats of Rain and Grogan were already placed for winter storage,

---

contractual term deemed offensive. The dominant party knows that the other would not accept the term, and thus employs the practices of minute print, unintelligible legalese, or high pressure sales technique. The dominant party realizes that the weaker party's assent is not genuine. Accordingly, the scholar's view, which we readily accept, is that as to the challenged clause or phrase, the essence of assent is absent."); Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 265 (3d Cir. 2003) ("A contract of adhesion is one which is prepared by the party with excessive bargaining power who presents it to the other party for signature on a take-it-or-leave-it basis.") (citation and internal quotation omitted).  There is no evidence that HCMS exerted any sort of pressure on Rain or Grogan or otherwise used unfair bargaining tactics toward the end of eliminating the choices available to Rain and Grogan for storing their boats.  Therefore, the WSA is not a contract of adhesion.

HCMS is not liable for damage caused to those boats as a result of its own negligence.

Additionally, the Court cannot determine as a matter of law whether Mike Perry acted in a grossly negligent manner when he set the *Forget-Me-Knot* ablaze. Given that HCMS could not limit its liability for gross negligence, see Sander, 334 F.3d at 717 n.3 ("We note that no circuit has allowed a party to absolve itself from higher levels of culpability, including gross negligence or recklessness.") (citation omitted), whether Perry was grossly negligent will be a question for trial.[7] Further, although the Court's ruling on HCMS's motion would seem to favor Perry as well, he, as an individual party represented by different counsel, has not moved for summary judgment and the Court will not enter summary judgment *sua sponte* in his favor.

### B. Standard Fire and Rabinowitz

The Court cannot grant summary judgment against Standard Fire as subrogee of Rabinowitz based solely on the terms of the WSA. Rabinowitz's situation is significantly different from that of Rain and Grogan. HCMS and Rabinowitz entered a separate agreement in which HCMS agreed to shrinkwrap the *Forget-Me-Knot*. If, as Standard Fire argues, Perry was acting pursuant to this winterization agreement, then the

---

[7] Despite HCMS's argument to the contrary, there is evidence upon which a finding of gross negligence can be made. Namely, the record contains evidence that Perry used a flame on a part of the *Forget-Me-Knot* that he could not see while he had no means by which to immediately extinguish any fire. This may be mere negligence or it may amount to gross negligence. The Court cannot rule out, as a matter of law, the possibility of a trier of fact finding gross negligence.

Court cannot enter judgment in favor of HCMS solely by reference to the WSA.  Rather the Court will need to consider whether the terms of the winterization agreement limit HCMS's liability in this situation.

        Having identified the issue, the Court need not proceed any further.  HCMS did not address the winterization agreement in its moving papers, relying instead on the terms of the WSA as the sole basis for its motion.  That approach was sufficient as against Rain and Grogan, but insufficient as against Rabinowitz.  Because it is disputed whether Perry was acting pursuant to the WSA or the winterization agreement, the Court will deny HCMS's motion for summary judgment with respect to Standard Fire as subrogee of Rabinowitz.

## IV. CONCLUSION

For the reasons expressed in the Opinion above, the Court will grant in part and deny in part the motion for summary judgment filed by HCMS. In particular, HCMS is entitled to summary judgment on its action seeking a declaratory judgment against Rain and Grogan–and therefore on their counterclaims for negligence as well. But HCMS is not entitled to judgment on its declaratory action against Rabinowitz on his counterclaim for negligence. Finally, the Court's ruling on HCMS's motion for summary judgment is necessarily fatal to the cross-motion for summary judgment. An Order will follow.

Dated: 7-8-05

s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge